******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

DANIEL ONOFRIO ET AL. *v.*
JOSEPH MINERI ET AL.
(AC 43158)

Moll, Alexander and Suarez, Js.

*Syllabus*

The plaintiffs sought to recover damages from the defendants M, T Co. and
G Co. for, inter alia, violations of the Connecticut Unfair Trade Practices
Act (§ 42a-110 et seq.) and from T Co. and G Co. for violations of
the New Home Warranties Act (warranties act) (§ 47-116 et seq.). The
plaintiffs purchased certain real property from G Co., which included
a house built by T Co. M, an owner of both T Co. and G Co., was aware
before the purchase that the house had a problem with water in the
basement, but he did not inform the plaintiffs. The trial court rendered
judgment for the plaintiffs on their CUTPA and warranties act claims,
and M and T Co. appealed to this court. *Held*:

1. The trial court properly determined that M was personally liable pursuant
   to CUTPA, but the court incorrectly determined that T Co. violated
   CUTPA.
   a. This court declined to review M and T Co.'s claim that the trial court's
   conclusion that they violated CUTPA was inconsistent with the judgment
   the court rendered in their favor on the plaintiffs' breach of contract,
   negligent misrepresentation, negligence and fraudulent concealment
   claims; M and T Co. failed to meaningfully analyze in their brief how
   the court's rendering judgment in their favor on the other claims was
   necessarily inconsistent with its conclusion that the finding that G Co.
   violated CUTPA should be applied to them, and, thus, this court deemed
   the claim abandoned.
   b. M could not prevail on his claim that the trial court erred in extending
   CUTPA liability to him on the basis of its finding that G Co. had violated
   CUTPA; the court found that the evidence established that M effectively
   controlled the closely held corporations G Co. and T Co. and that he
   had complete knowledge of the water problems in the basement and
   the representations or nonrepresentations given to the plaintiffs, and he
   either directly participated in the wrongful conduct or had the ability
   to control it.
   c. The trial court improperly extended to T Co., on the basis of a joint
   coordination theory, its finding that G Co. violated CUTPA; the court's
   conclusion that *Joseph General Contracting, Inc.* v. *Couto* (317 Conn.
   565) supported an extension of CUTPA liability to T Co. because it had
   jointly coordinated its activities with G Co. went beyond the issues
   considered by our Supreme Court in that case, which had considered
   only whether liability under CUTPA could be extended to an individual
   who engaged in unfair or unscrupulous conduct on behalf of a busi-
   ness entity.
2. T Co. could not prevail on its claim that the trial court erred in concluding
   that it was a vendor pursuant to statute (§ 47-118 (a)) and, thus, that it
   violated the implied warranty that the improvement on the plaintiffs'
   house was constructed in a workmanlike manner; T Co. was a vendor
   pursuant to § 47-116, as it was engaged in the business of erecting or
   creating an improvement on real estate, and, pursuant to statute (§ 47-
   119), a vendor who conveys an improvement to an intermediate pur-
   chaser to evade liability is liable to a subsequent purchaser, thus, T Co.
   was liable for a breach of the warranties act notwithstanding the fact
   that the plaintiffs directly purchased the house from G Co.

Argued November 30, 2020—officially released September 21, 2021

*Procedural History*

Action to recover damages for, inter alia, the defen-
dants' alleged unfair trade practices, and for other relief,
brought to the Superior Court in the judicial district of
New Haven where the matter was tried to the court,

*Hon. Jon C. Blue*, judge trial referee; judgment for the plaintiffs, from which the named defendant et al. appealed to this court. *Affirmed in part*; *reversed in part*; *judgment directed.*

*Scott Jackson*, for the appellants (named defendant et al.).

*Thomas J. Dembinski*, for the appellees (plaintiffs).

*Opinion*

MOLL, J. In this new home construction dispute, the defendants Joseph Mineri (Mineri) and Timberwood Homes, LLC (Timberwood), appeal from the judgment of the trial court, rendered after a bench trial, in favor of the plaintiffs, Daniel Onofrio and Elsie Onofrio, against (1) Mineri and Timberwood on the plaintiffs' claim pursuant to the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and (2) Timberwood on the plaintiffs' claim pursuant to the New Home Warranties Act (warranties act), General Statutes § 47-116 et seq.[1] We affirm in part and reverse in part the judgment of the trial court.

The trial court found the following facts that are relevant to our resolution of this appeal. "The named defendant . . . Mineri, is one of three brothers who, through their [businesses], work together in the contracting business." Mineri is a fifty-fifty owner of Timberwood with his brother, Louis. "Timberwood is in the business of building new homes. [Mineri] and one Alan Genn (not a party to this action) are fifty-fifty owners of G & M [Properties, LLC (G & M)]. G & M buys and sells real property. Christopher [Mineri (Christopher)] (also not a party) owns all or part of Mineri Excavating . . . ." Mineri testified at trial that he is actively involved in the operation of all three businesses.

The subject property is located at 6 Pine View Drive in North Branford (property). "A previous house at this location was destroyed by fire, leaving a foundation. [Mineri], through one or more of his [businesses] . . . purchased the property with the intention of building a new home on the existing foundation and 'flipping' it. Timberwood proceeded to build the home.

"The home was built over the existing foundation. Timberwood also built an adjacent garage, and, in the process of doing so, laid a foundation for the garage. The garage foundation is approximately four feet higher than the existing foundation for the house. In excavating the garage foundation, Christopher (the excavator of the Mineri family) saw water." Mineri was well aware that Christopher found water. "In addition, in the process of building the home, footings were dug in the existing foundation to hold 'lolly columns' to support the home. In digging these footings, [Mineri] saw water. Although it is unclear whether the water in question resulted from a high water table or runoff, [Mineri] was aware that there was a high water table in the neighborhood. In an attempt to resolve the [water] problem, he dug footing drains and waterproofed the foundation. The drains were connected to a cement pit buried in the yard."

In the fall of 2015, the plaintiffs, looking to buy their dream home, visited the property and decided to pur-

chase it. Prior to purchasing the home, the plaintiffs took a walk-through and saw the basement, which was dry at that time. Neither Mineri nor anyone else informed them of the water problems that Mineri and his brother Christopher had observed or of the existence of the high water table in the neighborhood. In the plaintiffs' view, because they were purchasing a new home, they did not need to employ a home inspector.

The plaintiffs initially executed a contract to purchase the property on December 17, 2015. This contract identified the " 'seller' " as G & M, but an addendum, identifying repairs that needed to be made, mistakenly identified the " 'seller' " as Timberwood. On January 15, 2016, after the mistake had been noticed, the plaintiffs executed a substantively identical contract, identifying G & M as the " 'seller' " in the main contract and the addendum. On January 27, 2016, an updated addendum, which identified G & M as the " 'seller' " and which identified additional repairs to be made, was executed. Paragraph 7 of the contract provides: "Buyer represents that Buyer has examined the Real Property and is satisfied with the physical condition subject to the Inspection Contingency if applicable. Neither Seller nor any representative of the Seller or Buyer has made any representation or promise other than those expressly stated herein which Buyer has relied upon in making this Agreement." On February 4, 2016, the town of North Branford issued a certificate of use and occupancy.

The closing on the plaintiffs' purchase of the property occurred on February 10, 2016. As part of the closing, the plaintiffs and G & M executed a so-called punch list agreement identifying additional repairs to be made by February 24, 2016, including a repair for " 'basement drain pipe leaking.' " Within one week of the closing, the plaintiffs saw water in the basement. Daniel Onofrio notified Mineri, and the two met on February 17, 2016. Mineri stated: " 'This is my responsibility, and I will take care of this ASAP.' " Mineri did not do so, a "lengthy saga of texts" between Daniel Onofrio and the Mineris ensued, and water continued to appear in the basement.

After months of promises, Mineri sent Christopher to deal with the problem. On October 31, 2016, a crew appeared at the property without announcement and dug up the yard in search of the cement pit that Mineri had installed when building the home. After much excavation, the pit was found without water in it. Christopher subsequently put a sump pump in the basement but did not arrange for an electrician to activate it. In April, 2017, the basement flooded with approximately four inches of water, destroying some of the plaintiffs' personal property. Thereafter, the plaintiffs hired an electrician to activate the sump pump.

On June 29, 2017, the plaintiffs commenced this action against the defendants. On September 8, 2017, the plaintiffs filed the operative complaint consisting

of six counts: (1) breach of contract (count one); (2) negligent misrepresentation (count two); (3) negligence (count three); (4) breach of warranties (count four); (5) fraudulent concealment (count five); and (6) violations of CUTPA (count six). Counts one, two, three, five, and six were directed to Mineri, G & M, and Timberwood. Count four was directed to G & M and Timberwood. The defendants filed an answer and special defenses. The case was tried to the court, *Hon. Jon C. Blue*, judge trial referee, on March 15, 18 and 19, 2019.

On June 17, 2019, the court issued its memorandum of decision rendering judgment as follows: (1) on count one (breach of contract), in favor of the plaintiffs against G & M in the amount of $22,340 and in favor of Mineri and Timberwood; (2) on count two (negligent misrepresentation), in favor of the plaintiffs against G & M in the amount of $22,340 and in favor of Mineri and Timberwood; (3) on count three (negligence), in favor of the defendants; (4) on count four (breach of warranties act), in favor of the plaintiffs against G & M and Timberwood in the amount of $22,340; (5) on count five (fraudulent concealment), in favor of the defendants; and (6) on count six (CUTPA), in favor of the plaintiffs against the defendants in the amount of $22,340. Although the court declined to award punitive damages under CUTPA, the court awarded costs and reasonable attorney's fees pursuant to CUTPA, stating that, by agreement of the parties, the amount of such fees would be addressed at a subsequent hearing. This appeal followed.[2] Additional facts and background will be set forth as necessary.

I

Mineri and Timberwood claim that the trial court erred in concluding that they violated CUTPA. Specifically, they contend that the court's conclusion that they had violated CUTPA through their " 'representations or nonrepresentations' " to the plaintiffs cannot stand because it is inconsistent with its finding in their favor on the plaintiffs' claims for breach of contract, negligent misrepresentation, negligence, and fraudulent concealment. They also contend that the court erred in extending CUTPA liability to them based on its finding that G & M had violated CUTPA. Although Mineri and Timberwood intertwine these arguments in their appellate brief, we distill and address them separately.

A

Mineri and Timberwood argue that the trial court's conclusion that they violated CUTPA through their omissions to the plaintiffs is inconsistent with its rendering judgment in their favor on the plaintiffs' claims for breach of contract, negligent misrepresentation, negligence, and fraudulent concealment. We do not reach the merits of this claim because it is inadequately briefed.

"Both this court and our Supreme Court 'repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited.' . . . *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016); see also *Parnoff* v. *Mooney*, 132 Conn. App. 512, 518, 35 A.3d 283 (2011) ('[i]t is not the role of this court to undertake the legal research and analyze the facts in support of a claim or argument when it has not been briefed adequately . . . .')." *Seaport Capital Partners, LLC* v. *Speer*, 202 Conn. App. 487, 489–90, 246 A.3d 77, cert. denied, 336 Conn. 942, 250 A.3d 40 (2021); see also Practice Book § 67-4.

In the present case, Mineri and Timberwood's brief fails to analyze how the court's rendering judgment in their favor as to the counts alleging breach of contract, negligent misrepresentation, negligence, and fraudulent concealment is necessarily inconsistent with the court's rendering judgment against them as to the count alleging CUTPA violations. That is, Mineri and Timberwood's brief contains no meaningful analysis as to how the court's treatment of the plaintiffs' allegations in support of counts one, two, three, and/or five is necessarily inconsistent with its conclusion, vis-à-vis count six, that its finding that G & M violated CUTPA should be applied to each of them. "Adequate briefing is necessary in order to avoid abandoning an issue on appeal. See, e.g., *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003)." *Seaport Capital Partners, LLC* v. *Speer*, supra, 202 Conn. App. 490. Because we conclude that Mineri and Timberwood have failed to meet their burden with respect to this particular argument, we deem it abandoned.

B

Mineri and Timberwood also contend that the trial court erred in extending CUTPA liability to each of them based on its finding that G & M had violated CUTPA. We disagree as to Mineri and agree as to Timberwood.

By way of background, the court found that the plaintiffs had established a CUTPA violation with respect to G & M. Specifically, the court found that "[t]he acts of nondisclosure by G & M discussed with respect to count one . . . offended public policy as it has been established by the common law. Under all of the circum-

stances they were also immoral, oppressive, and unscrupulous. Under well established Connecticut law, the plaintiffs have established a CUTPA violation with respect to G & M. The impact of this finding on the remaining defendants will be discussed . . . ."[3] The acts of nondisclosure, as found by the court with respect to count one, are as follows. Mineri failed to inform the plaintiffs of the water infiltration problem, which was known to him. That omission was worsened by Mineri's affirmative agreement to repair the leaking basement drainpipe, which would lead a reasonable purchaser to believe that such repair would fix whatever water problem remained in the basement. The court acknowledged the applicability of the legal principle that " '[a] seller of real or personal property is . . . ordinarily expected to disclose a known latent defect of quality or title that is of such character as would probably prevent the buyer from buying at the contract price.' 2 Restatement (Second), Contracts § 161, comment (d), pp. 433–34 (1981)." The court further stated that "[p]ublic policy discourages the use of fraud and misrepresentation with respect to unsuspecting purchasers of homes."

We turn to the standard of review and the applicable principles of law. "It is well settled that whether a [party's] acts constitute . . . deceptive or unfair trade practices under CUTPA, is a question of fact for the trier, to which, on appellate review, we accord our customary deference. . . . [W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Pedrini* v. *Kiltonic*, 170 Conn. App. 343, 353, 154 A.3d 1037, cert. denied, 325 Conn. 903, 155 A.3d 1270 (2017).

Our Supreme Court has stated that "[General Statutes §] 42-110b (a) provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some [common-law], statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the

degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . In order to enforce this prohibition, CUTPA provides a private cause of action to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice . . . ." (Internal quotation marks omitted.) *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, 296 Conn. 315, 350–51, 994 A.2d 153 (2010), quoting *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 18–19, 938 A.2d 576 (2008).

In *Joseph General Contracting, Inc.* v. *Couto*, 317 Conn. 565, 583, 119 A.3d 570 (2015), our Supreme Court considered whether there could be individual liability for a corporate entity's violation of CUTPA. Upon analyzing the relevant statutory text, the court first determined that "[t]he plain language of § 42-110b clearly indicates that an individual can be liable for a CUTPA violation." Id., 587. The court next considered "whether liability under CUTPA may be extended to an individual who engages in unfair or unscrupulous conduct on behalf of a business entity." Id., 588. In doing so, pursuant to the directive in § 42-110b, the court looked to the federal courts' interpretation of CUTPA's federal statutory counterpart, the Federal Trade Commission Act (federal act), 15 U.S.C. § 41 et seq. (2006), and observed: "The test used by the federal courts is uniformly stated, but it is flexible and highly fact specific in application. In order to hold an individual liable, a plaintiff, after showing that an entity violated the federal act, must prove that the individual either participated directly in the entity's deceptive or unfair acts or practices, or that he or she had the authority to control them. . . . The plaintiff then must establish that the individual had knowledge of the wrongdoing at issue. . . .

"An individual's status as controlling shareholder or officer in a closely held corporation creates a presumption of the ability to control . . . but is not necessarily dispositive in all cases. . . . On the other hand, an employee who is not an owner or officer may, under some circumstances, possess the requisite authority. . . . Authority to control may be established by evidence of an individual's conduct, such as his or her active involvement in business affairs and [participation in] the making of company policy. . . . Evidence that other employees of an entity deferred to the individual also is relevant. . . .

"The knowledge requirement may be established with evidence showing that the individual had actual knowledge of [the entity's] material misrepresentations, reckless indifference to the truth or falsity of such misrepre-

sentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth. . . . An individual's degree of participation in business affairs is probative of knowledge. . . . [T]he [plaintiff] is not required to show that a defendant *intended* to defraud consumers in order to hold that individual personally liable. . . . A good faith belief in the truth of a misrepresentation may, however, preclude individual liability under the federal act.

"The requirements of this test will necessarily preclude certain types of liability under CUTPA, namely, liability for merely negligent acts of an individual or the negligent acts of another, subordinate person in service to an entity. In order for any individual liability to attach under CUTPA, someone must knowingly or recklessly engage in unfair or unscrupulous acts, as contemplated by the statute, in the conduct of a trade or business." (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) Id., 589–92.

In the present case, with respect to extending CUTPA liability to Mineri on the basis of G & M's conduct, the court found that "[t]he evidence establishes that both G & M and Timberwood were closely held corporations and that . . . Mineri effectively controlled both corporations. . . . Mineri also had complete knowledge both of the water issues in the basement in question and of all the representations or nonrepresentations given to the [plaintiffs]. He was personally involved in each of the events (or nonevents) described in this opinion. He 'either directly participated in the wrongful conduct or, by virtue of his ownership, position, and day-to-day involvement' in the construction project in question 'had the ability to control it. Moreover, given the character of the actions at issue, [he] necessarily knew or should have known of their wrongfulness.' [*Joseph General Contracting, Inc.* v. *Couto*, supra, 317 Conn.] 593. . . . Mineri is therefore personally liable under CUTPA."

Applying the test adopted by the court in *Joseph General Contracting, Inc.*, described previously in this opinion, and satisfied that the court's factual findings are adequately supported by the record, we conclude that the court properly found Mineri personally liable under CUTPA. The court's conclusion remained faithful to the principle that an officer of a corporate entity does not incur personal liability for the entity's violation of CUTPA merely by virtue of his or her official position. Indeed, the court's factual findings support its determination that the test adopted in *Joseph General Contracting, Inc.*—which requires proof of (1) the entity's violation of CUTPA; (2) the individual's participation in the acts or practices, or the authority to control them; and (3) the individual's knowledge of the wrongdoing at issue—was satisfied. See *Joseph General Contracting,*

*Inc.* v. *Couto*, supra, 317 Conn. 589. Accordingly, Mineri's claim on appeal with respect to the judgment against him on count six fails.

With respect to extending CUTPA liability to Timberwood on the basis of G & M's conduct, the court stated: "Although the issue of Timberwood's CUTPA liability is less directly governed by precedent, the logic of both *Joseph General Contracting, Inc.*, and of CUTPA itself strongly indicates that Timberwood should be held liable here. As mentioned, [the Mineris] own Timberwood on a fifty-fifty basis. [Mineri] effectively controlled both Timberwood and G & M and used them in a common enterprise. CUTPA is intended to protect the rights of consumers such as the [plaintiffs]. It is the express intent of the legislature that CUTPA 'be remedial and be so construed.' [General Statutes] § 42-110b (d). CUTPA further directs the courts to 'be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act (15 U.S.C. § 45 (a) (1)),' in construing CUTPA. [General Statutes] § 42-110b (b). The [United States] Supreme Court has 'repeatedly held that the [c]ommission has wide discretion in determining the type of order that is necessary to cope with the unfair trade practices found . . . .' *Federal Trade Commission* v. *Colgate-Palmolive Co.*, 380 U.S. 374, 392, [85 S. Ct. 1035, 13 L. Ed. 2d 904] (1965). It has long been established that corporations cannot be permitted to evade the reach of antitrust laws by the use of holding companies and interlocking boards of directors. '[T]he interests of private persons and corporations cannot be made paramount to the interests of the general public.' *Northern Securities Co.* v. *United States*, 193 U.S. 197, 352, [24 S. Ct. 436, 48 L. Ed. 679] (1904). Courts, in cases such as this, are allowed to mold their decrees 'so as to accomplish practical results—such results as law and justice demand.' Id., 360.

"G & M, [Mineri], and Timberwood jointly coordinated their activities in this case. Those activities . . . violated CUTPA. Law and justice demand that all three defendants be held accountable under CUTPA."

When the court's decision is construed as a whole, it is apparent that the court found Timberwood liable under CUTPA based on a "joint coordination" theory. That is, on the basis of a theory that they jointly coordinated their activities, the court extended to Timberwood its finding that G & M had violated CUTPA. Although the court cited *Joseph General Contracting, Inc.* v. *Couto*, supra, 317 Conn. 565, as supporting the foregoing extension of CUTPA liability, such conclusion places weight on that decision that it cannot bear. As explained previously in this opinion, our Supreme Court addressed in *Joseph General Contracting, Inc.*, "whether liability under CUTPA may be extended to

an individual who engages in unfair or unscrupulous conduct on behalf of a business entity." Id., 588. The court did not have occasion to consider the extension of CUTPA liability to another entity that has a controlling shareholder or officer in common with the entity found to have engaged in unfair or unscrupulous conduct. We conclude that the court improperly extended its finding that G & M violated CUTPA to Timberwood on the basis of a so-called joint coordination theory.[4]

## II

Timberwood also claims that the trial court erred in rendering judgment against it on count four of the operative complaint for violation of the warranties act, specifically, for breach of the implied warranty that the improvement was constructed in a workmanlike manner. See General Statutes § 47-118 (a) (3). Timberwood exclusively contends on appeal that no warranties existed between it and the plaintiffs because it was not the selling vendor and, therefore, is not a "vendor" for purposes of § 47-118 (a). We disagree.

Whether Timberwood, as the builder of the plaintiffs' new home, qualifies as a "vendor" for purposes of § 47-118 (a) is a matter of statutory interpretation over which our review is plenary. "Well settled principles of statutory interpretation govern our review. . . . Because statutory interpretation is a question of law, our review is de novo. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Joseph General Contracting, Inc.* v. *Couto*, supra, 317 Conn. 586–87.

Resolving Timberwood's claim requires us to interpret various provisions of the warranties act. We begin with the text of § 47-118, which provides in relevant part: "(a) *In every sale of an improvement by a vendor*

*to a purchaser*, except as provided in subsection (b) of this section or excluded or modified pursuant to subsection (d) of this section, *warranties are implied that the improvement is*: (1) Free from faulty materials; (2) constructed according to sound engineering standards; (3) *constructed in a workmanlike manner*; and (4) fit for habitation, at the time of the delivery of the deed to a completed improvement, or at the time of completion of an improvement not completed when the deed is delivered.

"(b) The implied warranties of subsection (a) of this section shall not apply to any condition that an inspection of the premises would reveal to a reasonably diligent purchaser at the time the contract is signed. . . .

"(d) Neither words in the contract of sale, nor the deed, nor merger of the contract of sale into the deed is effective to exclude or modify any implied warranty; provided, if the contract of sale pertains to an improvement then completed, an implied warranty may be excluded or modified wholly or partially by a written instrument, signed by the purchaser, setting forth in detail the warranty to be excluded or modified, the consent of the purchaser to exclusion or modification, and the terms of the new agreement with respect to it. . . ." (Emphasis added.)

General Statutes § 47-116, which sets forth the definitions for chapter 827 "unless the context otherwise requires," defines " '[i]mprovement' " as "any newly constructed single family dwelling unit, any conversion condominium unit being conveyed by the declarant and any fixture or structure which is made a part thereof at the time of construction or conversion by any building contractor, subcontractor or declarant." Section 47-116 also defines " 'vendor' " as "any person engaged in the business of erecting or creating an improvement on real estate, any declarant of a conversion condominium, or any person to whom a completed improvement has been granted for resale in the course of his business." In addition, § 47-116 defines " 'purchaser' " as "the original buyer, his heirs or designated representatives."

We note at this juncture that the court found that "[t]he home at issue in this case is an 'improvement.' It is a 'newly constructed single family dwelling unit.' The preexisting foundation was a 'structure which [was] made a part of [the newly constructed single family dwelling unit] at the time of construction.' " The court also found that G & M is a " 'vendor,' " as defined in § 47-116, because "it is a corporate 'person to whom a completed improvement had been granted for resale in the course of [its] business.' " In addition, the court found that Timberwood is a " 'vendor,' " as defined in § 47-116, because "it is a corporate 'person engaged in the business of erecting or creating an improvement on real estate.' " The court went on to find that "[t]he home, being an 'improvement,' had an implied warranty

of, inter alia, being 'constructed in a workmanlike manner.' A home with a wet basement that periodically floods has not been constructed in a workmanlike manner, particularly when, as the evidence here shows, the problem would have been resolvable with a modest expenditure of funds." Those particular findings remain unchallenged on appeal. Moreover, it is undisputed that the plaintiffs are "purchasers" under § 47-116.

The question before us, which appears to be an issue of first impression, is whether the implied warranties created by § 47-118 "[i]n every sale of an improvement by a vendor to a purchaser"; General Statutes § 47-118 (a); are owed by the builder/vendor of such improvement to the original purchaser notwithstanding the fact that the home was sold by an intermediary vendor. For the reasons that follow, we answer that question in the affirmative.

First, the definition of "vendor," set forth in § 47-116, captures, inter alia, not only "any person to whom a completed improvement has been granted for resale in the course of his business" (i.e., a selling vendor who satisfies this definition), but also "any person engaged in the business of erecting or creating an improvement on real estate" (e.g., the builder of the new home). Second, pursuant to § 1-2z, we consider the relationship of § 47-118 to other statutes, specifically, General Statutes § 47-119, titled "Vendor not to evade by intermediate transfer," which provides: "Any vendor who conveys an improvement to an intermediate purchaser to evade the provisions of this chapter shall be liable to the subsequent purchaser as if the subsequent conveyance had been effectuated by the vendor to the subsequent purchaser." We construe these provisions to reflect the legislature's intent not to permit the builder of a newly constructed single family dwelling unit, who satisfies the definition of "vendor" set forth in § 47-116, to evade liability for breach of the implied warranties otherwise owed to an original "purchaser," as defined in § 47-116.[5]

In sum, we conclude that the implied warranties created by § 47-118 are owed by the builder "vendor" of an "improvement" to the original "purchaser" notwithstanding the fact that the home was sold by an intermediary "vendor," as those terms are defined in § 47-116. Accordingly, Timberwood's claim that the court erred in rendering judgment against it on count four fails.

The judgment is reversed with respect to the plaintiffs' CUTPA claim against Timberwood, and the case is remanded with direction to render judgment in favor of Timberwood on that claim; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] Judgment also was rendered against the defendant G & M Properties, LLC (G & M). G & M is not participating in this appeal. We refer to Mineri, Timberwood, and G & M collectively as the defendants and individually by name.

[2] G & M has not filed an appeal from the judgment, and the plaintiffs have not filed a cross appeal.

[3] Although the court also stated that "the actions alleged and proved in counts one, two, and four constitute a CUTPA violation," it appears that it specifically intended to have its findings, vis-à-vis G & M with respect to count one, extended to Mineri and Timberwood for purposes of CUTPA.

[4] The plaintiffs argue that the judgment against Timberwood as to count six should be affirmed because "[t]he evidence was legally sufficient for the [court] to find [that] Timberwood committed an unfair trade practice by its refusal to correct the basement water condition." This argument is unavailing because we do not interpret the court's opinion as having found Timberwood liable under CUTPA based on its refusal to correct the plaintiffs' water problem.

The plaintiffs further argue that Timberwood's violation of the warranties act may also support the imposition of CUTPA liability against it, and they suggest that this court hold that a violation of the warranties act is a per se violation of CUTPA. We reject the notion that the judgment against Timberwood as to CUTPA may be affirmed on these grounds. The trial court did not conclude that Timberwood had violated CUTPA by virtue of its violation of the warranties act. Moreover, our Supreme Court rejected such an argument in *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 229 n.17, 990 A.2d 326 (2010), stating: "To the extent that the plaintiffs claim that a violation of the warranties act is a per se CUTPA violation, we disagree." "[A]s an intermediate appellate court, we are bound by Supreme Court precedent and are unable to modify it . . . ." (Internal quotation marks omitted.) *Moutinho* v. *500 North Avenue, LLC*, 191 Conn. App. 608, 616, 216 A.3d 667, cert. denied, 333 Conn. 928, 218 A.3d 68 (2019).

[5] Timberwood contends, without any explication, that applying the implied warranties provisions set forth in § 47-118 to it, as a nonselling builder/vendor, will yield an absurd result. We find this contention to be without merit.